## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRANDON MILL MANAGER, LLC
539 N. Westover Boulevard
Albany, Georgia 31707

~AND~

BRANDON MILL TENANT, LLC
539 N. Westover Boulevard
Albany, Georgia 31707

*Plaintiffs,*

v.

THE UNITED STATES OF AMERICA,
United States Attorney
for the District of Columbia
501 3rd Street, NW
Washington, D.C. 20001

*Defendant.*

Civil Action No.   20-1279

## COMPLAINT

*COME NOW* Plaintiffs by and through undersigned counsel, and respectfully submit their Complaint, and for this cause of action state:

## PARTIES

1.      Plaintiff Brandon Mill Manager, LLC is a corporation existing under the laws of the state of Georgia with its principle place of business in South Carolina.

2.      Plaintiff Brandon Mill Tenant, LLC is a corporation existing under the laws of the state of Georgia with its principle place of business in South Carolina.

3.      Defendant United States of America is the government of the United States and is responsible for claims of negligence brought against the Federal Deposit Insurance Corporation, under the Federal Tort Claims Act.

## JURISDICTION & VENUE

4.      Jurisdiction and venue are proper in this Court pursuant to 12 U.S.C. §1821(d)(6)(A)(2).

5.      All conditions precedent to bring this suit have been satisfied.

## BACKGROUND

6.      Plaintiffs Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC are two limited liability companies formed in or about 2015 in the interest of a specific real estate development project: the "Brandon Mill Project" or the "Project".

7.      The Brandon Mill Project (or the "Project") describes the undertaking of purchasing "Brandon Mill"—a designated historic textile mill in Greenville, South Carolina —and developing it into loft apartments (now called the West Village Lofts), all while preserving the historic value and character of the mill.

8.      Such renovation and preservation work earns significant tax credits that are valuable to the investor members of the Project; by preserving and renovating historically significant properties, these tax credits, as provided for by state and federal law, include the tax credit allowable pursuant to 26 U.S.C. §47 for qualified rehabilitation expenditures incurred in connection with the certified rehabilitation of a certified historic structure.

9.      In 2015, multiple LLCs, including Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC, were formed to own, operate, and generate tax credits for the Project.

10.     Plaintiff Brandon Mill Manager, LLC owned 1% of the Brandon Mill Tenant, LLC.

11.     Plaintiff Brandon Mill Tenant, LLC owned 10% of Brandon Mill, LLC.

12.     Brandon Mill Manager, LLC (hereafter "Mill Manager") represents the interests of multiple investor members and had the responsibility to faithfully execute the business plan of the Project.

13.     Brandon Mill Tenant, LLC (hereafter "Mill Tenant") was formed for the purpose of leasing, holding, maintaining and operating the Brandon Mill property, and was also the entity that would be the recipient of the tax credits generated by the Project.

14.     Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC have certain economic interests and responsibilities related to the Project, as governed by multiple interrelated contracts, including an operating agreement with Brandon Mill, LLC (henceforth "Mill Owner"). Collectively, Mill Owner, Mill Manager and Mill Tenant are referred to as the "LLCs" henceforth.

15.     Although the LLCs are all separate and distinct legal entities, they are bound by interrelated contractual obligations and serve a single purpose, i.e. to make the Brandon Mill Project a financial success for all parties involved.

16.     To that end, in or about 2015, Brandon Mill borrowed $18 million from BB&T (the "BB&T Construction Loan") to begin the initial construction and rehabilitation phase of the Project. The BB&T Construction Loan was not permanent financing. It carried a floating interest rate and was secured by the real estate on which the Brandon Mill Property was located, as well as other collateral.

17.     Once the property was rehabilitated and reached 80% occupancy, it became eligible for permanent financing, at which point the LLCs looked to refinance the construction loans on more favorable terms, including a lower fixed interest rate.

18.     Additional financing for the Project was obtained by inviting investors to purchase membership interests in the LLCs.  Some investors purchase membership interests in the LLCs for the purpose of acquiring the tax credits described in Paragraph 8 above. These investors are referred to as the "investor member" in the LLCs.

19.     It is not intended that the investor members will have an ownership interest in the LLCs for longer than 5 years, which is the recapture period for the tax credits provided for under the Internal Revenue Code.

20.     At the end of the 5-year recapture period, the investor members' interest in the profits of the LLCs decreases materially, usually to 10% or less, reflecting the fact that the investor members' primary interest in the projects is in obtaining the tax credits. Furthermore, the LLCs may repurchase the investor members' interests in the LLCs at a price that reflects the investor members' significantly reduced interest in the LLCs.

21.     Investor members in the LLCs typically do not become involved in the day-to-day operations of the LLCs. But, they do have the right to approve major decisions involving the LLCs, e.g. the LLCs must obtain the consent of the investor member to incur and/or refinance debt.

## FIRST NBC BANK'S HISTORY OF REAL ESTATE INVESTMENT DEALS

22.     First NBC Bank has been an investor member in similar projects in the past with H. Pace Burt, Jr., the developer of the Brandon Mill project. For example, First NBC Bank was the investor member in the LLCs that rehabilitated and operate (i) the historic Schuyler Building located in Spartanburg, South Carolina and (ii) the historic Mobile Towers building located in Mobile, Alabama.

23.     Because First NBC Bank was always an investor member in the LLCs, it did not participate in the day-to-day operations of the LLCs. However, First NBC Bank faithfully discharged its obligations to the LLCs and their members and managers, providing consents as appropriate, including timely consent to incurring and refinancing debt.  For example:

24.     In November 2015, First NBC Bank responded to a request to refinance the debt on the Schuyler Building within 48 hours.

25.     In December 2015, First NBC Bank responded to a request to refinance the debt on Mobile Towers within 24 hours.

26.     It was and is critical that investor members in the LLCs promptly respond to requests to review and consent to the refinancing of debt by the LLCs in these situations. Typically, the LLCs are attempting to refinance millions of dollars in construction debt that (i) was never intended to be permanent financing, (ii) carries a floating or variable interest rate, which exposes the LLCs to interest rate risk, and (iii) carries an interest rate higher than the rate that can be obtained through permanent financing. First NBC Bank understood the importance of promptly responding to such requests, and it had always done so.

**FIRST NBC'S INVESTMENT IN THE BRANDON MILL PROJECT**

27.     First NBC Bank was interested in investing in the Brandon Mill Project and became an investor member in Mill Tenant. At all times relevant hereto, Mill Tenant had two members: Plaintiff Brandon Mill Manager, LLC and First NBC Historic Tax Partners, LLC ("Tax Partners"), which was owned and controlled by First NBC Bank.

28.     Tax Partners is a Louisiana limited liability company and is the Investor Member of Mill Tenant. Tax Partners' primary motivation for investing in Mill Tenant was to obtain the tax credits generated by the Brandon Mill Project. After the expiration of the 5-year recapture period for those tax credits, Tax Partners' interest in Mill Tenant will decrease dramatically, from 90% to 10%. And, under a put agreement, Tax Partners will be entitled to sell its interest in Mill Tenant to Plaintiff Brandon Mill Manager, LLC after the 5-year recapture period and for fair market value. However, that value will be based on Tax Partners' reduced interest in Mill Tenant, i.e. 10%, not 90%.

29.     As a member of Mill Tenant and having a vested interest in the success of the Project, Tax Partners owed duties of reasonable care, fiduciary duties and duties of good faith and fair dealing to the LLCs, including the Plaintiffs in this case.

30.     Mill Tenant's operations are governed by a written operating agreement. Under the terms of the operating agreement, the Managing Member, which is Mill Manager, is responsible for all aspects of the day-to-day operations of Mill Tenant. However, Mill Manager's authority is not unlimited. For example, Mill Manager cannot cause Mill Tenant to incur debt without the consent of the Investor Member, i.e. Tax Partners.

31.     Other protections for Tax Partners were also built into the documents governing the Brandon Mill Project. For example, under the Master Lease between Mill Owner (including Mill Manager) and Mill Tenant, Mill Manager could not act to refinance the BB&T Construction Loan without the consent of Tax Partners. Similarly, under Paragraph 5.2 of Mill Owner's Operating Agreement, Mill Tenant's consent is required for Mill Manager to refinance the BB&T Construction Loan, and Tax Partners had the power to withhold that consent. However, Tax Partners must exercise these powers in a manner that is consistent with its duties described in Paragraph 26 above.

32.     In early February 2017, the Brandon Mill Project achieved 80% occupancy, which meant that the Project was stabilized and eligible for permanent financing to refinance the BB&T Construction Loan. For reasons previously explained, it was advantageous for Mill Manager to refinance its debt in this way. Accordingly, Mill Manager began looking for opportunities to refinance the BB&T Construction Loan.

### THE FDIC BECOMES THE RECEIVER FOR FIRST NBC BANK AND TAKES OVER THE OPERATIONS OF TAX PARTNERS

33.     On or about April 28, 2017, the Louisiana Office of Financial Institutions closed First NBC Bank, and the Federal Deposit Insurance Corporation (the "FDIC") was named Receiver for First NBC Bank.

34.     Shortly thereafter, Brad Calloway, who had been employed by First NBC Bank and was retained and employed by the FDIC, officially notified Mill Tenant and Mill Manager that the

FDIC, in its capacity as Receiver for First NBC Bank, would be operating and acting for Tax Partners. As such, the FDIC succeeded to and assumed the fiduciary duties and duties of good faith and fair dealing described above.

35.     Consistent with its mandate as Receiver, the FDIC began looking for ways to liquidate the assets of First NBC Bank, including Tax Partners. Accordingly, in May 2017, Mr. Calloway, acting on behalf of the FDIC, asked Mill Manager to make an offer to purchase Tax Partners' membership interest in Mill Tenant.

36.     On or about May 25, 2017, in response to the inquiry described in the preceding paragraph, Mill Manager offered to purchase Tax Partners' interest in Mill Tenant for $90,162.50. This offer price was calculated based on a number of factors, including the income that Tax Partners could be expected to receive as a result of its interest in Mill Tenant and the reduction in Tax Partners' interest in the profits of Mill Tenant that would take place after the 5-year recapture period expired.

37.     The FDIC did not respond to this offer.

### THE FDIC REFUSES TO COOPERATE WITH THE REFINANCING

38.     In April and June 2017, Mill Manager received terms sheets from Arbor Commercial Funding ("Arbor") reflecting the terms on which Arbor would provide Mill Manager with permanent financing to refinance the BB&T Construction Loan.

39.     The Arbor terms sheets were very favorable for the LLCs, particularly the June terms sheet, which contained the following terms: (i) $20 million principal, which was necessary to refinance the $18 million balance of the BB&T Construction Loan and pay the $2.5 million developer's fee, and (ii) a projected interest rate of 3.96%, which fell to as low as 3.85% during the summer of 2017. The Arbor terms sheet was also very favorable to Mill Tenant and Mill Manager, because it would place the Brandon Mill Project on secure financial footing and help ensure the financial success of the Project.

40.     Over the summer of 2017, the LLCs, through Mr. Burt, made repeated requests that the FDIC, in its capacity as Receiver for First NBC Bank, give Tax Partners' consent to proceed with refinancing the BB&T Construction Loan on the terms set forth in the Arbor terms sheet. These requests included information and documentation that would enable the FDIC to properly evaluate and consider the requests for consent to the refinancing.

41.     Despite repeated inquiries and prodding, the FDIC did not respond to Mr. Burt's or the LLCs' requests for consent to the Arbor terms sheet and the refinancing of the BB&T Construction Loan in the summer of 2017. The FDIC acknowledged receiving these requests, understood the urgency of the requests and did not request additional information regarding the Arbor terms sheet.

42.     The FDIC purposefully and intentionally took no action whatsoever and delayed providing consent.

43.     At the time, the FDIC's behavior was negligent, because refinancing the BB&T Construction Loan would significantly benefit all persons and entities involved with the Project, as explained above.

44.     At this time, FDIC still had contractual and fiduciary obligations to the LLCs.

45.     With the FDIC's and Tax Partners' consent, Mill Manager would have refinanced the BB&T Construction Loan with Arbor at a fixed rate of 3.96% for 10 years.

46.     As a result of the FDIC's failure and refusal to give its consent to the Arbor terms sheet, the LLCs could not secure refinancing through Arbor and lost the ability to lock in the very favorable terms described above. The FDIC's failure and refusal to consent to refinancing on those terms caused economic damage to both Mill Manager and Mill Tenant.

47.     In September 2017, Mill Manager, through Mr. Burt, began to suspect that the FDIC was using its power to block the refinancing of the BB&T Construction Loan as leverage to secure a

better offer from Mill Manager to buy out Tax Partners' membership interest in Mill Tenant, i.e. the FDIC would consent to the refinancing of Mill Owner's debt only if Mill Manager agreed to pay substantially more for Tax Partners' interest in Mill Owner than it was actually worth, which was a breach of its fiduciary duties and duties of good faith and fair dealing.

## MR. BURT SECURED ALTERNATIVE FINANCING ON BEHALF OF THE LLCS BUT THE TERMS ARE SIGNIFICANTLY LESS FAVORABLE

48.     By failing to refinance the BB&T Construction Loan, the LLCs were also subject to interest rate risk, i.e. if interest rates suddenly spiked, then the costs of the LLCs debt service would also increase, potentially putting the entire Project at risk.

49.     On or about October 2, 2017, the LLCs, through Mr. Burt, secured an alternative commitment to refinance the BB&T Construction Loan from Synovus (the "Synovus Commitment"). The terms of the Synovus Commitment were not nearly as advantageous as the Arbor terms sheet. Specifically, but not exclusively, the Synovus Commitment was for only $18 million and carried an interest rate of 4.15%.

50.     Three days later, on October 5, 2017, the LLCs shared the Synovus Commitment with the FDIC and requested the FDIC's consent to proceed with refinancing the BB&T Construction Loan.

51.     The FDIC responded by promising to consider the Synovus Commitment, but tied that issue to the terms on which Tax Partners would "exit" the deal, i.e. the purchase of Tax Partners' interest in Mill Tenant.

52.     The FDIC's attempt to tie these issues, i.e. consent to refinancing with the purchase of Tax Partners' interest in Mill Tenant, further caused the LLCS, through Mr. Burt, to suspect that the FDIC was using its power to block the refinance of Owner's debt to leverage a better, and unrealistic, price, for Tax Partners' interest in Mill Tenant. As a result, Mr. Burt threatened to assert legal claims against the FDIC if it did not consent to the Synovus Commitment.

53.     Finally, on October 23, 2017, and only after having been threatened with legal action, the FDIC, acting as the Manager for Tax Partners, belatedly consented to Mill Manager pursuing a refinancing of the BB&T Construction Loan via the Synovus Commitment.

## THE FDIC ABUSES ITS POWER AND THREATENS THE LLCs

54.     Despite giving its consent to the Synovus Commitment, the FDIC continued to use improper leverage in an attempt to force Mill Manager to buy out Tax Partners' interest in Mill Tenant at an excessive price.  Specifically, on or about November 7, 2017, the FDIC, acting through its agent, Randy German demanded that Mill Manager "start negotiations" for Tax Partners' interest in Mill Tenant at "$6 million to $10 million," which is far in excess of its value.

55.     On January 30, 2018, the LLCs, through Mr. Burt, closed on a loan from Synovus (the "Synovus Loan") and thereby refinanced its debt and the BB&T Construction Loan. The terms of the Synovus Loan are as follows: $18 million in principal, with a five-year interest rate lock at 4.15%.

56.     While the terms of the Synovus Loan are an improvement over the terms of the BB&T Construction Loan, they are not as good as the terms that the LLCs, through Mr. Burt, could have obtained if the FDIC had complied with its duty to exercise ordinary care, its fiduciary duties and its duties of good faith and fair dealing and had given its consent to the Arbor terms sheet described above.

57.     The FDIC acted negligently and/or breached its fiduciary duties and its duties of good faith and fair dealing to the LLCs by virtue of:

   a.  Failing to timely review the Arbor terms sheet described in Paragraph 39 above.

   b.  Failing to consider and consent to the Arbor terms sheet described above.

   c.  Attempting to extort an exorbitant price for Tax Partners' interest in Brandon Mill Tenant, LLC by refusing to consent to the Arbor terms sheet described above.

   d.  Making threats and actions described above.

e.   Failing to exercise reasonable care in the oversight and supervision of its employees and contractors who were acting for and on behalf of Tax Partners.

58.     As a result of the negligence, breaches of fiduciary duty and good faith and fair dealing described above, Mill Manager and Mill Tenant have suffered significant economic damages.

## COUNT I
## BREACH OF FIDUCIARY DUTY
## UNITED STATES OF AMERICA

59.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

60.     Upon becoming Receiver for First NBC Bank, FDIC assumed the duties and obligations of First NBC Bank.

61.     As a member of Brandon Mill, LLC, those duties and obligations included a fiduciary duty owed to Brandon Mill, LLC and the other members of Brandon Mill, LLC, including Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

62.     By failing to timely respond to the request to sign off on new financing, FDIC breached its fiduciary duty to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

63.     As a proximate cause of their breach of fiduciary duty, FDIC caused injury to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

64.     The damages incurred as a proximate result of FDIC's actions include but are not limited to economic loss as detailed above.

65.     The United States is responsible for the FDIC's breach under the Federal Tort Claims Act.

## COUNT II
## BREACH OF CONTRACT
## UNITED STATES OF AMERICA

66.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

67.     Upon becoming Receiver for First NBC Bank, FDIC assumed the duties and obligations of Frist NBC Bank, including those contained in the LLC's operating agreement.

68.     As a member of Brandon Mill, LLC, the duties and obligations contained in the operating agreement were owed to the LLC and all other members, including Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

69.     FDIC breached their contractual obligations to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

70.     As a proximate cause of this breach, FDIC caused injury to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC. The damages incurred as a proximate result of FDIC's actions include but are not limited to economic loss as detailed above.

71.     The United States is responsible for the FDIC's breach under the Federal Tort Claims Act.

### COUNT III
### NEGLIGENCE
### THE UNITED STATES OF AMERICA

72.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

73.     Upon becoming Receiver for First NBC Bank, FDIC assumed a duty to act in a reasonable manner to assure the economic success of Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

74.     FDIC breached that duty and failed to act in a reasonable way by, including but not limited to, failing to timely respond to requests to refinance the debt obligations, failing to understand its obligations under the LLC agreement, and failing to take reasonable steps to assure that Brandon Mill, LLC and all members of the LLC, including Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC, did not suffer economic injury.

75.     In breaching those duties, FDIC proximately caused Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC to suffer injury, including economic and non-economic, as described above.

76.     The United States is responsible for the FDIC's breach under the Federal Tort Claims Act.

**COUNT IV**
**BREACH OF SOUTH CAROLINA**
**UNIFORM LIMITED LIABILITY COMPANY ACT DUTY OF LOYALTY**
**UNITED STATES OF AMERICA**

77.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

78.     Limited liability companies in South Carolina must adhere to that state's Uniform Limited Liability Company Act., South Carolina Code §§33-44-101, *et seq.*

79.     Section 33-44-409 governs the relationship between members of limited liability companies.

80.     That section includes a duty of loyalty that prohibits a member of a limited liability company from acting in a manner adverse to the limited liability company.

81.     FDIC, though its agents, servants, and employees, breached this duty of loyalty by threatening and actually interfering with the refinancing of Brandon Mill, LLC as described above.

82.     As a proximate cause of this breach of the FDIC's duty of loyalty, the FDIC caused injury to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

83.     The damages incurred as a proximate result of the FDIC's actions include but are not limited to economic loss as detailed above.

84.     The United States is responsible for the FDIC's breach under the Federal Tort Claims Act.

**COUNT V**
**BREACH OF SOUTH CAROLINA**
**UNIFORM LIMITED LIABILITY COMPANY ACT DUTY OF CARE**
**UNITED STATES OF AMERICA**

85.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

86.     Limited liability companies in South Carolina must adhere to that state's Uniform Limited Liability Company Act., South Carolina Code §§33-44-101, *et seq.*

87.     Section 33-44-409 governs the relationship between members of limited liability companies.

88.     That section includes a duty of care that prohibits a member of a limited liability company from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

89.     FDIC, through its agents, servants, and employees, breached this duty of care by threatening and actually interfering with the refinancing of Brandon Mill, LLC as described above in a manner that was grossly negligent, reckless, and intentional.

90.     As a proximate cause of this breach of the FDIC's duty of care, the FDIC caused injury to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

91.     The damages incurred as a proximate result of the FDIC's actions include but are not limited to economic loss as detailed above.

92.     The United States is responsible for the FDIC's breach under the Federal Tort Claims Act.

**COUNT VI**
**INTENTIONAL INTERFERENCE WITH**
**PROSPECTIVE CONTRACTUAL RELATIONS**
**UNITED STATES OF AMERICA**

93.     Plaintiffs incorporate all preceding paragraphs as if restated herein.

94.     FDIC, though its agents, servants, and employees, intentionally interfered with the prospective contractual relations of Plaintiffs.

95.     Specifically, FDIC intentionally interfered with Plaintiffs' ability to refinance the Brandon Mill, LLC construction loan by accepting the loan from Arbor.

96.     As a proximate cause of this intentional interference, FDIC caused injury to Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC.

97.     The damages incurred as a proximate result of the FDIC's actions include but are not limited to economic loss as detailed above.

98.     The United States is responsible for the FDIC's breach under the Federal Tort Claims Act.

**WHEREFORE**, Plaintiffs Brandon Mill Manager, LLC and Brandon Mill Tenant, LLC respectfully request judgment be entered in their favor in an amount to be determined at trial, but well in excess of the jurisdictional minimum, including but not limited to economic loss, non-economic loss, attorneys' fees, plus costs of this suit, and such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Christopher T. Nace
Christopher T. Nace, #977865
PAULSON & NACE, PLLC
1025 Thomas Jefferson St., NW
Suite 810
Washington, DC 20007
ctnace@paulsonandnace.com
202-463-1999 Tel.
202-223-6824 Fax
Counsel for Plaintiffs

**\*\*\*PLAINTIFFS DEMAND TRIAL BY JURY ON ALL COUNTS\*\*\***

/s/ Christopher T. Nace
Christopher T. Nace, #977865